# FILED

DISTRICT COURT OF GUAM

JUN 2 8 2005

MARY L.M. MORAN
CLERK OF COURT



IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff.<br><br>vs.<br><br>HAROLD J. CRUZ and ERNEST MUNA,<br><br>Defendants. | MAGISTRATE CASE NO. 05-00007<br><br>**FINDINGS OF FACT**<br>**and**<br>**CONCLUSIONS OF LAW** |

This case came before the Court for a bench trial on June 21 and 22, 2005. The Information (Docket No. 31) charged both Defendants[1] with two Class B Misdemeanors. The first count was brought under the Assimilative Crimes Act, 18 U.S.C. §§ 7(3) and 13, and alleged the Unlawful Taking of Wildlife in violation of Guam law. The second count was for unlawfully Entering Military Property.

I.    **Count 1: Unlawful Taking of Wildlife**

Count 1 of the Information specifically alleged that:

> On or about April 9, 2005, in the District of Guam, the defendants, HAROLD J. CRUZ and ERNEST Q. MUNA, at a place within the special maritime and territorial jurisdiction of the United States, namely Andersen Air force Base, Guam, on land acquired for the use of the United States and under its concurrent

---

[1] The Defendants will be referred to individually by their last names and collectively as the "Defendants."

1    jurisdiction, did knowingly and unlawfully take wildlife, to wit: deer or wild pigs
2    with an artificial light in violation of Title 5, Guam Code Annotated, Section[s]
     63121 and 63125, and Title 18, United States Code, Sections 7(3) and 13.

3    Count 1 essentially alleges a violation of two separate local statutes: Sections 63121

4    and 63125 of Title 5, Guam Code Annotated. Guam law prohibits the taking of any wild or

5    feral animal except as authorized by law or regulation. 5 GUAM CODE ANN. § 63121.

6    Furthermore, Guam law prohibits the taking of game with the use of an artificial light. 5 GUAM

7    CODE ANN. § 63125.

8        It shall be unlawful for any person to take[2] any game[3] with a spotlight or any
         other artificial light of any kind. To be found with any spotlight with any rifle,
9        shotgun, or other firearm, and with ammunition, after sunset, in any wooded
         section or other place where any game may reasonably be expected, shall be
10       prima facie evidence of [a] violation of this section.

11   Id. (footnotes added).

12   Thus, in order for the Defendants to be found guilty of Count 1, the Government must

13   prove as to each defendant each of the following elements beyond a reasonable doubt: (1) on or

14   about April 9, 2005, the defendant was within the special maritime and territorial jurisdiction of

15   the United States, namely Andersen Air force Base, Guam; and (2) the defendant violated Guam

16   law, specifically 5 GUAM CODE ANN. § 63121 or 63125.

17   Officers Ragadio and Aguon testified that on April 9, 2005, they observed "scanning"

18   activity along the tree line area north of the road depicted in Exhibit 14. This "scanning" was

19   described as a light source moving from left to right and right to left in a sweeping fashion.

20   Officer Aguon testified that he observed the Defendants exit the jungle area where he had

21   observed the scanning activity and then proceed south along Route 3A near Ritidian Point. Mr.

22   Ogden prepared Exhibits 28 through 30. He testified that these maps depict Andersen Air Force

23

24       [2] Guam statute defines "take" to mean "hunt, pursue, catch, capture, angle, seize, kill,
25   trap, [wound], shoot in any way or by any agency or device; every attempt to do such acts or to
     assist any other person in the doing of or the attempt to do such acts." 5 GUAM CODE ANN.
26   § 63101 (g).

27       [3] "Game" is defined as "all native or introduced species of wild birds or wild or feral
28   animals." 5 GUAM CODE ANN. § 63101(e).

1    Base ("AAFB") property in orange. He further stated that the area where the Defendants were

2    observed exiting the jungle and later apprehended is AAFB property. When questioned by

3    defendant Cruz's counsel, Mr. Ogden stated that the data he used to determine the outer

4    boundary of AAFB property came from a professional survey conducted previously. While the

5    Defendants both deny knowing that they were on AAFB property, Count 1 does not require that

6    the Defendants knew they were on AAFB property. Thus, the Government has proven beyond a

7    reasonable doubt that the Defendants were on AAFB property, which, pursuant to 8 U.S.C.

8    § 7(3), is within the special maritime and territorial jurisdiction of the United States.

9         The next question is whether the Defendants violated Guam law, specifically Sections

10    63121 or 63125, while within the special maritime and territorial jurisdiction of the United

11    States. A violation of Section 63121 requires proof of each of the following elements beyond a

12    reasonable doubt: (1) the defendant did intentionally take; (2) a wild animal; and (3) without

13    lawful authorization. Alternatively, a violation of Section 63125 requires the Government to

14    prove beyond a reasonable doubt each of the following elements as to each defendant: (1) the

15    defendant did unlawfully and intentionally take; (2) game; and (3) with a spotlight or any other

16    artificial light of any kind.

17         The testimony at trial showed that on the morning of April 11, 2005 – two days after the

18    night in question – conservation officers searched the area where the Defendants were

19    apprehended and discovered a "badly decomposed" deer carcass. See Exhibit 29. Officer

20    Ragadio testified that the carcass appeared to be 2-3 days old, while Officer Camacho testified

21    that the carcass appeared to be about 4-6 days old. Officer Camacho further stated that the

22    carcass was too decomposed to determine the means of death. Based on this testimony and the

23    Government's exhibits (see Exhibits 31-32), the Court can not conclude that the deer carcass is

24    connected to the Defendants' activities. This, however, does not automatically result in a not

25    guilty verdict on Count 1 as the taking of game or a wild animal does not require that the hunter

26    be successful. It is sufficient for the Government to show that an individual attempts to hunt,

27    capture or kill game or a wild animal, or assist another in such acts. See 5 GUAM CODE ANN.

28    § 63101(g).

1    The Court finds that the Government has met its burden of proving a prima facie case

2  against defendant Muna for the unlawful use of artificial light, in violation of 5 GUAM CODE

3  ANN. § 63125. The statute presumes a "taking" if an individual is in a wooded area after sunset

4  with an artificial light, a firearm, and ammunition. Here, defendant Muna was in a wooded area

5  or other place where game may reasonably be expected after dark. The testimony of the

6  conservation officers was that on April 9, 2005, at about 2:45 a.m., the Defendants exited the

7  jungle area north of the road depicted in Exhibit 14 and proceeded to walk on and along Route

8  3A near Ritidian Point. When Officer Aguon turned on the headlights of the vehicle he was

9  driving, the Defendants fled into the jungle area along Route 3A and were later apprehended.

10  See Exhibits 14 and 30. The conservation officers testified that there are deer and wild boar in

11  the area. The Defendants themselves contended that defendant Muna brought the shotgun along

12  to protect them from wild boar in the area. Thus, defendant Muna was clearly in a wooded

13  section or other place where any game may reasonably be expected after sunset.

14    Defendant Muna was also in the possession of an artificial light, a firearm, and

15  ammunition. Defendant Muna admitted that the black flashlight and the shotgun, which were

16  found in the vicinity of his apprehension (see Exhibits 23 and 24), belonged to him. The

17  shotgun was registered to defendant Muna and was found to be functioning properly. See

18  Exhibits 25 and 26. Additionally two unexpended shotgun shells (Exhibit 27) were discovered

19  on the ground about three to four feet in front of the shotgun. The Court infers that these

20  shotgun shells belonged to defendant Muna because if defendant Muna actually brought the

21  shotgun with him for protection, he would have brought along shotgun shells. Based on these

22  facts, the Government has established a prima facie violation of Section 63125 against

23  defendant Muna.

24    While a prima facie case has been proven, defendant Muna may rebut the presumption

25  that he has violated Section 63125. Defendant Muna testified that he was in the area to check

26  on his crab traps which he had set along the lower portion of the cliff line. He denied that he

27  was hunting or attempting to hunt for deer or wild boar during the night in question. Defendant

28  Muna also tried to assert that the flashlight he was carrying was too small for hunting and was in

1   fact not as bright as he expected it to be, thus resulting in the Defendants getting lost while they

2   were checking on the crab traps. Defendant Muna's actions, however, belie his testimony. If in

3   fact defendant Muna was not illegally spotlighting for game, then why did he run and hide in the

4   jungle when confronted by the conservation officers.

5          Defendant Muna stated that when he exited the jungle area after getting lost, a vehicle

6   approached the Defendants with its lights off. Suddenly the vehicle's headlights were turned on,

7   and two individuals exited the vehicle and yelled "Halt or I'll shoot!" Believing it was a

8   possible poacher, defendant Muna ran and hid in the jungle. Defendant Cruz also testified that

9   there was a lot of yelling and commotion and that he heard someone shout "stop or I'll shoot!"

10  Both Defendants denied ever hearing the conservation officers identify themselves until after

11  they had been apprehended.

12         The conservation officers have a different version of the events. Officers Ragadio and

13  Aguon stated that when they exited their official vehicle, they yelled "Halt! Conservation

14  Officer!" Officer Aguon also testified that they were trained to identify themselves from the

15  start for officer safety. Additionally, Officer Camacho testified that when he arrived at the

16  scene, he could hear Officers Aguon and Ragadio yelling "Halt, halt, Conservation Officer!"

17         The Court disbelieves the Defendants' testimonies that the conservation officers did not

18  identify themselves when they exited the vehicle to initiate the apprehension of the Defendants.

19  Officer Aguon had just heard what he believed was a gun shot, and Officers Ragadio and Aguon

20  went to investigate. They were heading into an area where known poaching activity took place.

21  They were trained to immediately identify themselves as law enforcement when apprehending

22  illegal hunting suspects. It would not have been reasonable for the officers to yell "halt or I'll

23  shoot." Instead, the Court concludes that Officers Ragadio and Aguon identified themselves as

24  conservation officers by yelling "halt, conservation officer." The Defendants' testimonies to the

25  contrary is just not credible. Both Defendants have law enforcement backgrounds. Defendant

26  Cruz was a former marshal with the Superior Court of Guam. Defendant Muna serves with the

27  Guam Army National Guard. They would not have run off into the jungle because they were

28  scared and frightened of possible poachers as they would have this Court believe. The Court

1  believes that the Defendants ran into the jungle when they realized that conservation officers
2  had just spotted them coming out of the jungle with a flashlight and a gun.

3        As for the small black flashlight held by defendant Muna, Officer Ragadio testified that
4  it emits enough illumination to light up a deer's eyes. Officer Ragadio further testified that
5  hunters normally carry and use small flashlights so that they can handle their weapons, such as a
6  shotgun or rifle, at the same time. He also stated that hunters prefer dimmer lights in the
7  Northwest Field area so that they will be less likely to be spotted by conservation officers. The
8  Court disbelieves defendant Muna's assertions that the flashlight was too dim. Defendant Cruz
9  and the Government stipulated that there was no moon out that night. If defendant Muna was as
10 afraid of the wild boars and pigs as he said he was that dark, moonless night, he would have
11 brought along a flashlight which was capable of emitting enough light to enable him to check on
12 his crab traps. Furthermore, the Court does not believe that the Defendants got lost while
13 checking on the traps. Defendant Muna testified that when he checks his twenty or so traps
14 along the lower portion of the cliff line, he does not back track and head back in the same
15 direction he entered the jungle. Instead, he usually walks up along the cliff to the flat area on
16 top where he then uses his cellular phone to call for his ride to pick him up along Route 3A near
17 Ritidian Point. This is the same area where the Defendants were apprehended on the night in
18 question. Defendant Muna stated that the area where his traps are located is "dead space" where
19 his cellular phone does not work, so he has to climb to the top where he can get cellular service.
20 This testimony would contradict the Defendants' testimonies about getting lost or disorientated
21 while checking on the traps. Because the Court does not believe defendant Muna's testimony
22 and finds him not to be credible about the events on the night in question, the Court equally
23 disbelieves defendant Muna when he states that he was *only* checking on his crab traps and was
24 not hunting. Instead, the Court finds that defendant Muna, armed with a shotgun and
25 ammunition, was using his flashlight to spot deer or other game while he was walking in the
26 jungle on the night in question. Officer Ragadio testified that the Defendants did not have a
27 permit to spotlight deer or other game. Thus, the Court concludes that defendant Muna has not
28 rebutted the prima facie case proven by the Government, and accordingly finds defendant Muna

1  GUILTY as to Count 1 of the Information.

2      As to defendant Cruz, the statutory presumption of a "taking" does not apply to him.

3  Like the co-defendant, defendant Cruz was in a wooded area after sunset. However, he did not

4  have a gun, ammunition or an artificial light on his person. Officers Ragadio and Aguon

5  testified that they noticed a second individual with a light. When defendant Cruz was

6  apprehended, however, he did not have a flashlight in his possession and none was found nearby

7  when officers apprehended him. Instead, two days later conservation officers discovered a blue

8  flashlight (Exhibits 22 and 22a) approximately 15 to 20 feet from where defendant Muna – and

9  not defendant Cruz – was apprehended. The testimonies and evidence is not strong enough to

10  link defendant Cruz to the blue flashlight found in the vicinity. Moreover, even if the blue

11  flashlight was used by defendant Cruz, a prima facie case against him was still not established

12  because of the lack of a firearm and ammunition in his possession.

13      The Government's theory of the case was that defendant Cruz "assisted" defendant

14  Muna in taking or attempting to take game by unlawfully using the flashlight. The Government

15  argued that most hunters go out in pairs or groups to assist in carrying the dead animal out of the

16  jungle. Thus, the Government essentially asserts that defendant Cruz aided and abetted

17  defendant Muna.

18      A defendant may be found guilty of a crime, even if he personally did not commit the act

19  or acts constituting the crime but aided and abetted in its commission. Ninth Circuit Model

20  Criminal Jury Instruction 5.1. Here, in order to prove defendant Cruz guilty of aiding and

21  abetting, the Government must prove beyond a reasonable doubt that: (1) defendant Muna

22  committed the crime of Unlawful Taking of Wildlife; (2) defendant Cruz knowingly and

23  intentionally aided, counseled, commanded, induced or procured defendant Muna to commit

24  each element of Unlawful Taking of Wildlife; and (3) defendant Cruz acted before the crime

25  was completed. Id. Furthermore,

26  ///

27  ///

28  ///

> [i]t is not enough that the defendant merely associated with the person
> committing the crime, or unknowingly or unintentionally did things that were
> helpful to that person, or was present at the scene of the crime. The evidence
> must show beyond a reasonable doubt that the defendant acted with the
> knowledge and intention of helping that person commit [the crime charged].

Id.

In the present case, the Government has not proven beyond a reasonable doubt that

defendant Cruz knowing and intentionally aided, counseled, commanded, induced or procured

defendant Muna to commit the offense of Unlawful Taking of Wildlife. Instead, the evidence

showed that the Defendants first met each other that evening by pure coincidence. This was not

a planned meeting. Mr. Artero testified that defendant Cruz's sole purpose in going to Ritidian

with him that night was to catch some coconut crabs that defendant Cruz could then serve at his

daughter's birthday party planned for the following week. This testimony was not even

challenged by the Government. It is not sufficient that defendant Cruz was associated with

defendant Muna and was present at the scene of the crime. Because the Government has not

met its burden of proving beyond a reasonable doubt that defendant Cruz aided and abetted

defendant Muna, the Court finds defendant Cruz NOT GUILTY as to Count 1 of the

Information.

## II.   **Count 2: Entering Military Property**

The second count of the Information charged both Defendants with Entering Military

Property, in violation of 18 U.S.C. § 1382, and asserted that:

> On or about April 9, 2005, in the District of Guam, the defendants, HAROLD J.
> CRUZ and ERNEST Q. MUNA, went upon a United States military reservation,
> to wit: Andersen Air force Base, Guam, for a purpose prohibited by law or lawful
> regulation, that is, intending to engage in conduct in violation of . . . Title 5,
> Guam Code Annotated, Section[s] 63121 and 63125, in violation of Title 18,
> United States Code, Section 1382.

Count 2 charges the Defendants with intentionally going upon a United States military

reservation, namely Andersen Air Force Base, for a purpose prohibited by law or lawful

regulation, that is attempting to take wildlife or game with the use of an artificial light in

violation of Guam law. In order for the Defendants to be found guilty of this charge, the

Government must prove as to each defendant each of the following elements beyond a

1   reasonable doubt that: (1) on April 9, 2005, the defendant knowingly went upon a United States

2   military reservation; and (2) the entry on the United States military reservation was with the

3   intent to engage in a purpose prohibited by law or regulation, specifically 5 GUAM CODE ANN.

4   §§ 63121 and 63125.

5           Unlike Count 1, the Government must prove that the Defendants knowingly entered

6   AAFB property. "An act is done knowingly if the defendant is aware of the act and does not act

7   through ignorance, mistake, or accident. The government is not required to prove that the

8   defendant knew that his acts or omissions were unlawful." Ninth Circuit Model Criminal Jury

9   Instruction 5.6.

10          Here, the Government's exhibits depicted white signs along the right side of Route 3A

11  heading towards Ritidian Point. See Exhibits 5-7, 10, 12-13, 15, 17, and 20. These signs stated

12  "Warning. U.S. Air Force Installation. It is unlawful to enter this area without permission of

13  the Installation Commander. While on this installation all personnel and the property under

14  their control are subject to search." See Exhibit 1. Additionally, Exhibit 9 depicted a

15  photograph of a brown sign along the left side of Route 3A which stated, among other things,

16  "Andersen AFB." This was the only sign along the left side of Route 3A. Officer Ragadio

17  testified that the brown sign was located about one and a half miles from where the Defendants

18  were located. Additionally, there are no signs along the rights side of the road leading down to

19  the wildlife refuge that would inform an individual that the property belonged to AAFB.

20          The Defendants testified that they did not know they were on property that belonged to

21  AAFB. Defendant Cruz stated that when he and defendant Muna exited the jungle area, they

22  walked on the side of Route 3A that had no signs along it since the other side – the side with the

23  signs – belonged to AAFB. Defendant Cruz testified that he thought he was on property that

24  would revert to the Government of Guam or to the original landowners. Additionally, defendant

25  Muna testified that on prior occasions, AAFB security personnel had seen him walking along

26  the left side of Route 3A as depicted in Exhibit 14 and did not stop him or advise him that he

27  was on AAFB property.

28          Based on the testimony and the lack of signs along the left side of Route 3A, it was

1　reasonable for the Defendants to believe that they were not on property belonging to AAFB.

2　From the numerous signs posted along the right side of the roadway, the Air Force clearly has

3　the ability to delineate its property with warning signs. Because the Defendants are not

4　professional surveyors, nor are many of the unsuspecting visitors to the area, the Air Force has

5　the responsibility of putting up appropriate warning signs along both sides of Route 3A.

6　Finally, the Court notes that while the Government's brown sign (Exhibit 9) may inform an

7　individual going to the area that the left side of Route 3A belongs to AAFB, it does not advise

8　the person that entry onto the property is prohibited. Nor does it advise any potential trespassers

9　that is illegal to take wildlife in the area, regardless of whether it is to hunt game or to take

10　coconut crabs, unless authorized to do so. The Court encourages the Air Force to set up signs

11　warning the public of the prohibition against hunting in the area or taking of property belonging

12　to the Air Force without the permission of the Installation Commander. Accordingly, the Court

13　finds both Defendants NOT GUILTY as to Count 2 of the Information.

14　　　　　　　　　　　　　　　**CONCLUSION**

15　　　　Based on the above, the Court finds defendant Muna GUILTY as to Count 1 of the

16　Information and NOT GUILTY as to Count 2 of the Information. Additionally, the Court finds

17　defendant Cruz NOT GUILTY as to both Counts 1 and 2 of the Information. Defendant Muna

18　and counsel shall appear for sentencing on Tuesday, September 20, 2005 at 10:00 a.m. While

19　the United States Sentencing Guidelines do not apply in this instance, the Court nonetheless

20　directs the United States Probation Office to prepare a Presentence Report which will aid the

21　Court in fashioning an appropriate sentence. Said report shall be provided to the parties no later

22　than Monday, August 15, 2005. The parties shall file any response to the report no later than

23　Tuesday, September 6, 2005.

24　　　　SO ORDERED this 28th day of June 2005.

25　Notice is hereby given that this document was
entered on the docket on _6-28-05_ .

26　No separate notice of entry on the docket will
be issued by this Court.　　　　　　　　　JOAQUIN V.E. MANIBUSAN, JR.
United States Magistrate Judge

27　　　Mary L. M. Moran

28　　Clerk, District Court of Guam

By: _Manly B. Alan 6-28-05_
Deputy Clerk　　　Date